415 So.2d 978 (1982)
Larry WOODS
v.
PETROLEUM HELICOPTERS, INC., et al.
No. 14833.
Court of Appeal of Louisiana, First Circuit.
May 25, 1982.
Lee W. Rand, Badeaux, Discon, Cumberland & Barbier, New Orleans, for appellant.
J. Mark Graham, Henderson, Hanemann & Morris, Houma, for appellees.
Before LEAR, CARTER and LANIER, JJ.
CARTER, Judge.
This workmen's compensation case is before us on appeal from a judgment of dismissal holding that the injured party had received all compensation due him. We affirm.
After a series of various jobs with various employers, on March 6, 1980, appellant Woods went to work for Petroleum Helicopters, Inc. as a laborer and general maintenance man. On June 2, 1980, Woods was injured in the course and scope of his employment. Petroleum Helicopters, Inc. was insured by American Home Assurance Company who paid workmen's compensation *979 benefits to Woods for temporary disability through September 8, 1980. Woods filed suit on November 13, 1980, alleging that he was permanently disabled and seeking weekly benefits, medical expenses, and penalties.[1] It is the dismissal of this suit that he is appealing.
On the day of the accident, Woods and a co-employee were repairing a golf cart, the rear end of which was suspended from a chain hoist. As Woods was lifting the rear end, it became disconnected from the chain hoist, and most of the weight of the cart came down on him. Woods testified at trial that he felt a snap in his back at the time of the accident but did not experience any immediate pain and finished out the work day. He did experience some pain sitting in a car riding home from work. He testified that by the next morning, "I noticed it wasn't there, ...". Nevertheless, when he reported the accident at work that morning, he stated that he felt he needed to see a doctor. After complaining several times to his immediate superior, Woods was allowed to fill out an accident report and was sent to Dr. Hector Ruiz. Dr. Ruiz prescribed medication and released Woods from work until Friday.[2] On Friday evening, Dr. Ruiz admitted Woods to a hospital where he remained for six days.
Appellant's low back pain worsened, and Dr. Ruiz called in Dr. Jeffrey Fitter, an orthopedic surgeon. Dr. Fitter began his examination and treatment of Woods on June 9, 1980. Woods stated to the doctor that the pain had lessened somewhat with hospital treatment, but he still had moderate discomfort in the right low back area. He further stated to Dr. Fitter that he had had transient pain in both of his legs immediately after his injury but had experienced no pain in his legs since then. Dr. Fitter felt that Woods had sustained an acute lumbar strain but could find no objective clinical findings of injury. Dr. Fitter advised Dr. Ruiz that Woods appeared to be improving with treatment in the hospital and did not recommend any changes in the program. He felt that Woods was getting over his problem at that time and could probably be discharged from the hospital in a short period of time. He further felt that Woods might require out-patient treatment for one to two weeks before returning to work.
The treatment prescribed for Woods while in the hospital was rest in an orthopedic bed, application of hot packs to the painful areas of his back, and medications for muscle relaxation and pain. Dr. Fitter re-examined Woods on June 19 and found that the tenderness of the lumbar muscle was gone. Although Dr. Hector Ruiz, in one of his reports, stated that he had found muscle spasms, Dr. Fitter stated that he had no record of Woods having any muscle spasms at any time. Dr. Fitter found no sign of herniated disc or other serious lesion; however, he instructed Woods to remain in bed for another two or three weeks. He prescribed a muscle relaxant and Darvocet N-100, a pain reliever, as needed. On July 3, Dr. Fitter again examined Woods, and Woods continued to complain about low back pain and pain in his right anterior thigh. Dr. Fitter testified that Woods was "somewhat dramatic in his voluntary restrictions of motion in the back." He found a full range of motion in the lumbar spine. A straight leg raising test was positive with the patient in the supine position, but the same straight leg raising test was negative with Woods in the sitting position. Dr. Fitter testified that he performs the test *980 both in the supine and sitting positions to determine if the patient is being sincere. He explained that if the straight leg raising sign is positive in the supine position, it will also necessarily be positive with the patient sitting.
Dr. Fitter again examined Woods on July 29, and despite Woods's complaint of low back pain, Dr. Fitter found the results of the examination to be normal except for "voluntary guarding against passive range of motion in the lumbar spine and complaints of vague pain in that area." He advised Woods that he could not find anything wrong with his back, and that he felt a second orthopedic opinion would be appropriate before releasing him from treatment. He referred Woods to Dr. Russell Grunsten, an orthopedic surgeon in New Orleans.
Dr. Grunsten performed an orthopedic examination on Woods on August 25, 1980. This examination was essentially negative and confirmed Dr. Fitter's findings. Dr. Grunsten observed rigidity of musculature which he testified is an uncommon response for any injury of the back. He stated that standing rigid, as Woods did, will produce pain in a person who has a back injury. He found Woods's range of motion restriction uniform in each direction. He testified that, invariably, when there is an injury to the back, that injury is one that mechanically interferes with one direction of motion, but not all four directions of motion. As did Dr. Fitter, he found that straight leg raising in the supine position brought complaints of pain from Woods but that there was no complaint of pain from the straight leg raising test in the sitting position. Woods further complained of pain in the back of the thigh when Dr. Grunsten slowly bent Woods's knee. Dr. Grunsten testified that this is not physiologically explainable or possible. X-rays revealed no abnormalities and only a slight scoliosis of the lumbarsacral spine convexed to the left. Dr. Grunsten did not consider this scoliosis to be an abnormality because he was of the opinion that it was "obviously positioned." Dr. Grunsten testified:
"Because of the history revealed, the physical examination, the x-rays studies that we had done, it was my opinion that this patient presented what I identified as a grossly contradictory straight leg raising response; as well as an overall range of motion of the low-back area. No objective evidence of mechanical interference could be identified, nor was any objective evidence of nerve root irritation.
It was my feeling that the current x-rays were within normal limits. With this consideration, I was unable to identify any objective evidence of injury residual referable to the low back and it was felt by me that this patient could be permitted to resume what for him would be a normal daily physical activity program."
Dr. Grunsten further testified:
"Q. Doctor, the straight leg raising test you have noted and explained to us very well that they were completely contradictory, is that physiologically explainable, is there any explanation for such a contradiction?
A. It is physiologically not explainable. I would contemplate that this patient is magnifying his complaints. He is attempting to have me believe there is injury greater than there is or that there is injury where there is none.
Q. You also mentioned rigidity of the musculature and flexion being things inconsistent with a back injury.
A. That's correct. These are not findings that are associated with true back injury pathology."
Dr. Grunsten also testified that a "lumbar facet syndrome" is no longer a medically acceptable diagnosis and that use of the term stems from misinformation popular over twenty years ago. He further stated that Woods exhibited no problems referrable to the facets and had no mechanical problems in his back facet, disc, vertebrae, musculature, or otherwise. In short, after thorough examination, Dr. Grunsten could find no evidence of injury and was of the opinion that plaintiff could resume his normal activity without difficulty and that *981 Woods greatly magnified his complaints in an apparent attempt to deceive the physician. After receiving Dr. Grunsten's report, Dr. Fitter released Woods from treatment on September 12, 1980.
On September 4, 1980, Woods was referred to Dr. Kenneth Vogel, a neurosurgeon, by his attorney. Dr. Vogel found a moderate degree of motion in all directions and focal muscle spasms in the left multifidis triangle. He described the multifidis triangle as the very lowest part of the back where the sacrum and ilium join in a triangle. He also found mild scoliosis to the right. He performed a straight leg raising test and found it to be positive and further found hypalgelsia of the left foot. Considering the above findings, Dr. Vogel felt that Woods suffered a permeated disc and a lumbar facet syndrome secondary to an acute lumbosacral strain. He prescribed conservative care, medication, and physiotherapy. Dr. Vogel next saw Woods on October 30, and Woods complained of low back and bilateral leg pain. Examination revealed mild muscle spasms present bilateraly. Dr. Vogel recommended that Woods continue the conservative care he had initiated before. On December 2, 1980, Dr. Vogel again saw Woods and he was still complaining of severe low back pain and left leg pain, with mild muscle spasm on the right. At this time, Dr. Vogel recommended that Woods be hospitalized and a myelogram performed. Woods was scheduled to enter the hospital on January 4, 1981, but did not because he could not make financial arrangements. It was established during the trial that Woods made demand upon appellees to provide this medical service and was refused.[3] Dr. Vogel next saw Woods on March 17, and Woods complained of low back pain and bilateral leg pain, in the left more than the right. Dr. Vogel found focal muscle spasm in the multifidis triangle again. In summary, Dr. Vogel felt that Woods either sustained a chronic lumbosacral strain, lumbar facet syndrome, or hernia of the disc. He felt Mr. Woods would not be able to return to his former employment.
Appellant Woods testified that the golf cart was jacked up by two separate chains, one on each side. The chains were connected to the top of the building, and when the chain on the side that he was working on slipped he felt the pressure of the cart on him. His co-worker, Ray Lee, ran from the other side to give him some assistance, but Woods had "already felt it snap, you know." He did not experience immediate pain. He continued to work from about 4:45 p. m. to about 5:30 pm. After that, he rode home with a co-worker and experienced some pain in his back sitting in the seat of the co-worker's vehicle. The next morning he noticed that the pain wasn't there. He testified to the various consultations, examinations, and treatments by the various physicians, including Dr. Hector Ruiz, who did not testify in this case. He testified that he continually experienced pain in the low back area. At trial, he pointed out the area to be to the right of the midline of the back or the midline on or above the belt line. He described the examination by Dr. Grunsten as very cursory and stated that Dr. Grunsten specifically told him he could not return to workin direct contravention of the doctor's testimony.
Appellant contends that the trial court erred in disregarding the testimony of Dr. Vogel, who counsel contends was the claimant's treating physician. Appellant cites the case of Kinsey v. Travelers Ins. Co., Inc., 402 So.2d 226 (La.App. 1st Cir. 1981) to support his argument for the proposition that Woods had the right to select a physician of his choice as his treating physician. Kinsey is clearly distinguishable from the instant case. Certainly an injured employee is permitted to select the physician of his choice as his treating physician while he is in need of treatment and undergoing treatment. In Kinsey, it was not disputed *982 that the claimant needed additional treatment. The dispute was whether the claimant had the right to choose his own doctor and compel the insurance company to pay for the treatment by a physician of his choice. This case is not authority for the proposition that the plaintiff in a workmen's compensation case is entitled to select a physician upon whom the title "treating physician" is to be bestowed thereby making the "treating physician's" testimony entitled to greater weight than that of an "examining physician". It is highly possible and quite often the case than an individual will have two or more "treating physicians" and certainly the treating physicians' testimony is entitled to greater weight than the opinion of an "examining physician". See LaBorde v. Roy O. Martin Lumber Company, Inc., 316 So.2d 440 (La.App. 3rd Cir. 1975), writ refused 320 So.2d 207 (La. 1975); Launey v. Lawton Forest Products, 309 So.2d 901 (La.App. 3rd Cir. 1975); Moulard v. Massman Construction Company, 209 So.2d 742 (La.App. 3rd Cir. 1968); Martinez v. Equitable Equipment Company, 330 So.2d 634, 637 (La.App. 4th Cir. 1976). In the instant case, we find that Dr. Fitter was the original treating physician and Dr. Vogel was the treating physician after Woods had been discharged by Dr. Fitter. In very well prepared findings of fact and reasons for judgment, the trial court stated:
"Plaintiff's testimony concerning his physical condition is completely contradicted by the great weight of medical testimony. It is apparent to the Court that plaintiff is exaggerating his complaints. The complaints which he does have do not fit any physiological pattern and, therefore, can only be concluded to be insincere.
He did indeed sustain an injury by accident in the course and scope of his employment but he has not borne the burden of proving that he was disabled beyond early September when he was released by Dr. Fitter as able to return to work. He has been paid compensation for that entire period.
Plaintiff's claim for penalties and attorney's fees must likewise fail because the action of the insurer in terminating compensation was more than adequately supported by the medical evidence at that time. Plaintiff argues that subsequent medical evidence from Dr. Vogel so changed the picture that not only should penalties and attorney's fees be awarded but compensation should have been reinstated and defendants should be required to pay for the diagnostic studies proposed by Dr. Vogal (sic). However, plaintiff's argument overlooks the facts that the great weight of evidence is in opposition to the opinion of Dr. Vogal (sic) that plaintiff continues with legitimate complaints. Defendants actions were in no way arbitrary.
The basic issue in the case is plaintiff's credibility and the Court has not been impressed by him favorably in this regard. His description of the examination given him by Dr. Grunston (sic) certainly does not compare favorably with Dr. Grunston's (sic) testimony. Further, he stated that Dr. Grunston (sic) specifically told him that he could not return to work and this is in direct contravention of the doctor's findings and his testimony. His testimony specifically contradicts that of Dr. Grunston (sic) as to the number and type of tests administered."
The evidence is sufficient to maintain the trial court's determination that the injury was not such as to render the claimant disabled beyond September 8, 1980. A trial court may accept or reject an opinion expressed by a medical expert, depending on what impression the qualifications, credibility, and testimony of the expert make on the court. In evaluating the testimony of medical experts, the trial judge must consider the opportunities each physician had for observation and examination of the patient and the expert's familiarity with the patient and the patient's history. In deciding whether an employee has proven his claimed disability, the totality of the evidence, medical and lay, must be considered. Tantillo v. Liberty Mutual Insurance Company, 315 So.2d 743 (La.1975); Batiste v. Pointe Coupee Constructors, Inc., et al., 401 So.2d 1263 (La.App. 1st Cir. 1981).
*983 It is the trial judge's function to determine the weight which is to be accorded the medical and the lay testimony. In carrying out this function, the court below apparently gave greater weight to the medical testimony of Dr. Fitter and Dr. Grunsten than to that of Dr. Vogel. The trial judge discounted the lay testimony. The trial judge apparently concluded that the plaintiff was exaggerating his complaints and that his complaints did not fit any physiological pattern and were therefore insincere.
It is well established that on appellate review the trial court's factual findings as to disability are entitled to great weight. They are not to be disturbed in the absence of manifest error. Batiste v. Pointe Coupee Constructors, Inc., supra; Cadiere v. West Gibson Products Co., Inc., 364 So.2d 998 (La.1978); LaBorde v. Roy O. Martin Lumber Company, Inc., 316 So.2d 440 (La.App. 3rd Cir. 1975), writ denied, 320 So.2d 207 (La.1975).
We conclude that a reasonable evaluation of evidence supports the trial court's finding that Mr. Woods was no longer disabled after September 8, 1980, and this finding will not be disturbed. Having arrived at the above conclusion, it is unnecessary to consider appellant's contention that the trial judge erred in denying penalties and attorney fees. For the above and foregoing reasons, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] Suit was filed against Petroleum Helicopters, Inc. and "American International Insurance Company". In answer to this suit, Petroleum Helicopters, Inc. set forth "... there is no such entity as American International Insurance Company." Petroleum Helicopters, Inc. set forth that it had workmen's compensation insurance but did not set out the name of the company. Though the pleadings do not reflect the proper name of the insurer, it was developed in the trial of the case that American Home Assurance Company was the workmen's compensation insurer. Except for their appellate briefs, various pleadings filed by both appellant and appellee continue to carry the erroneous caption. For this appeal we will consider Petroleum Helicopters, Inc. as the sole appellee.
[2] The injury occurred on Tuesday.
[3] Apparently, a stalemate existed between appellant and appellee. Defendant-appellee's Exhibit # 3 indicates that appellee requested that Woods submit to another medical examination and that Woods refused to do so unless outstanding medical bills and overdue compensation benefits were paid, and unless hospitalization was authorized for a myelogram.